Good morning, Your Honor. James Andre Bowles for Mr. Lyons. And this case comes out of the Nevada District Court, Las Vegas, after there was a recommendation by a magistrate judge to dismiss four of the five counts. The count that remained was count number four, which was a policy count. And that case went to Judge Mahan, who correctly noted that Mr. Lyons no longer had standing to bring that count. So the case, the entire case, was dismissed at that point. Our position is Judge Mahan was not incorrect in finding that there was no longer standing, because there was no longer standing based on the adoption of Judge Cook's order that found that he didn't have a serious medical need. That's where the mischief lies here, Your Honors, is there was, in fact, a serious medical need, as established right from the very beginning, because the serious medical need arose when Mr. Lyons no longer had the prednisone. He was totally cut off of prednisone. He complained to Sergeant Farrow that he needed this prednisone and he was ill, and he said in his kite that he was seriously ill and this could be a very serious matter. And that's in the record established in that kite. Pregnison is a steroid? It is a steroid. And when you say stop, does that mean he was not tapered off the steroid, just stopped? Exactly, Your Honor. When you cut off the steroid without tapering, there's a reaction. And in this case, it's what they call Addison's disease, but more importantly, and this is the serious medical need, it's the Addisonian crisis that develops, and that can be fatal. Now, we just heard about Dr. Scott. It's the same institution from the other case that was immediately prior to this. Dr. Scott's part in this thing really didn't come about until about four days later. Dr. Scott really wasn't involved in this thing. The real problem lies with Sergeant Farrow, who made the decision to deny this – this Let me talk to you a little bit about the facts, because how you characterized them is different than I thought you were going to. It was my understanding that your client went to see a nurse about a prednisone running out, and she said, oh, that might be a problem, so I'll give you 30 days extra, or a certain extra, and then she said, and we'll see what we can do about getting in to see the doctor. Then he doesn't do anything more about that until he's about to have it run out again, and then he goes in to see another nurse, and this time it's Leonard. And that nurse says, well, I don't have any authority to prescribe or do this, and then says, come back after pill call, and we'll do something about it. And he doesn't. And then, after he doesn't come back, then he fills out a kite, because she told him to do it, and she asks the doctor the next day, Dr. Scott, what she should do, and gets an appointment with Dr. Scott. Now, with Farrell, as I understand it, and I guess you can correct me, what he did is he had this kite, which was for exceptional treatment, I guess. He immediately calls the nurse. The nurse says that he didn't have a current order of that, was going to see the doctor the following Thursday, and so he didn't do something about it. But they were all relying, as I understand it, on the doctor. Now, you're suggesting the doctor hasn't any problem. The doctor recognized — well, he asked when to get a refill. But — Well, let me start with the first fact you gave my colleague here. Is there a dispute, or is it conceded that that first day, the nurse told him to come back and fill out a requisition or a kite or whatever it was, and that he didn't go back? Well, my client is — my recollection in the record is that he did go. They said something about coming back, but when he came back, she told him — somebody told him to leave because he was getting rather excited. That's his testimony. Well, I guess we ought to look at the record, because I didn't see that. All I saw was that the plaintiff did not return when she told him to come after a bill call, and then he came back another time later the next day, whereupon she says, make out a kite. And he did, and she set up the doctor's appointment. The problem at that point, Your Honor, is he no longer has the prednisone. He's never ceased taking prednisone. He was not aware until he became sick that this sudden cessation could possibly kill him. So we don't — it's not a big issue what happened before he quit taking the prednisone. Once he became ill, he told Sergeant Farrell, through a grievance, that I am now ill. I understand that this is being caused by the cessation of prednisone. Get me some help. At that point, they say, come back three days from now, the 4th of February. So whether my client may have been somehow negligent in not following all the rules to a T, the problem he had didn't start until that was gone. So this is totally unexpected for him. He didn't — he knew there was some risk, but suddenly he becomes quite ill. He does some research and finds out that this could kill me. At this point, he goes to Sergeant Farrell. Sergeant Farrell goes to Leonhardt, who tells Sergeant Farrell, I can't do anything. She doesn't say, I deny the grievance. She does not deny the grievance. Sergeant Farrell denies the grievance on his own after he's told that Leonhardt can't do anything for Lyons. So whatever happened before, whatever happened — Can you tell me what days you were saying that didn't happen — you don't care about what happened before, what day? January 31st is the day he didn't get his refill, is my understanding. And that's when the — he submitted a kite that day, and that's — Actually, the kite was on February 1st, Your Honor. Well, on January 31st, I have — Leonhardt was asked for a prescription, and she said no, but send a kite. And she says that she told him to come back that night, and she'd help him. And — but her notes don't say that she told him to come back. And I'm not quite sure what he says. I think he says nobody told him to come back. But he did submit the kite, what, the next day? On the first, when he became ill, the next day, he submitted a kite, and this kite says, I'm sick. It's a — it is a medical emergency. And thereafter, they — Leonhardt says, I can't do anything. Farrow denies the grievance. After Farrow denies the grievance, he gets sicker and sicker and sicker until Dr. Scott sees him three, four days later. February 3rd, I think. February 3rd. On February 4th, the doctor sees him. And at that time, they give him an injection of this mega dose of prednisone, and it pulls him out. So, you know, here he is, four days ill. Nobody will see him. Nobody takes care of him. Farrow makes a medical decision because Leonhardt said she can't help him. She doesn't deny his kite.  I'm not a doctor. And so he's sick, sick, sick, and sicker until he finally gets to see a doctor. So there's just no reason for this to go on. All they had to do was give him a prednisone pill once a day during that — or that — just that first day, and then follow up with whatever he needs. I'm out of time. So if the Court has any further questions. Thank you, counsel. Thank you. Good morning again, Your Honor. Stephen Quinn. What I alluded to in the other case arises here to the extent that it applies to the facts of this case. And that is that with the facts presented as they are, undisputed, the only basis to find that there might be a triable issue regarding delivered indifference is whether the medical emergency exists to the level that it implicates the Constitution. Mr. Lyons' own conduct brought about the discontinuation, if you will, of the prednisone from the standpoint that he allowed his prescription to lapse. And then when he allowed it to lapse without taking care to see to it that there would be no lapse, he then went to a nurse who, I guess correctly, doesn't have authority to prescribe. So she says you have to wait. Now, we have a four-day window there, three or four, depending on how you look at it, where the doctor's going to see the Mr. Lyons. Doctor's got an appointment for Mr. Lyons. So the only deliberate, the only area of any question of a breakdown in treatment is in that four-day window. And now we have a question, again, is the inmate says, well, I need to get it now. And if you don't get it to me now, then you're liable for a constitutional violation. And the doctor says, I don't need to get it to you now. I'm going to see you in a few days. And when he sees him in a few days, he treats him. I think it's a problem, but I don't think it's a problem that lies, that rises to the problem is created by Mr. Lyons. That's the problem. I'd just like to dispose of a couple of things, just a couple of issues. But I don't understand. It's the first time he ran out, the nurse gave him the prescription. Yes, and I just, I can't explain that. I don't know how nurses get around, give prescriptions without the doctor signing off. And then the second time we went back to a nurse and they said, we can't do it. Yes, and I think the law is probably on the side of that latter instance. Well, it certainly would seem more on that side if somebody had kind of fudged on the rule the first time to get him through, and then nothing happened. Well, I mean, I can tell you the law is the nurses can't prescribe. So why the nurse did it the first time, how she did it, and whether it was a violation of her own rules and regulations is a question only doctors can prescribe it under Nevada law. I can tell you that for sure. But so the first nurse accommodated him and then he allowed it to lapse again without taking care to see to it that it's renewed. When he went to see the second nurse, was he already out of medication? My understanding is that he had he just ran out. Yes, he's out. He doesn't have another pill. So when he goes to see the when he went to see the first nurse, was he out? I don't know that. I don't. I do not know that. But you do know when he goes to see the second on the second occasion, a different nurse, he's completely out of medication. That's my understanding. He allowed his he fully used up his script. He's out of the medication. He needs to get it refilled. Do does the record tell us whether either of those nurses were aware of the medical consequence of an abrupt termination of a steroid treatment? I do not believe so. Certainly a doctor would know that. A doctor would. Was it communicated to the doctors, Dr. Scott or whomever, that on the second occasion that the inmate was completely out of medication? I don't know that the record reflects the nature of the communication. I do believe the record does reflect the nature of the communication, included at least. I don't know what else. Included that Lyons wanted to see the doctor and wanted to see him immediately. And my understanding is the doctor said, well, we have an appointment set up. My understanding of the record is the appointment existed and the doctor said, I'm not moving it forward. Okay. I mean, if a homeless person or any individual stumbled into an emergency room outside the correctional setting and told the medical personnel that they had run out of a steroid medication, you would think that they would recognize that you can't just be abrupt. Whoever is responsible, you can't just terminate a steroid medication because it has consequences. I don't know what the facts are regarding the medical consequences and whether they are precipitous or whether they are something that can be allowed to occur over a period of days because we have something there. I don't know that the record is clear on that. I don't know that that's been developed in the record. Dr. Scott apparently made a decision. I know what his condition is. I know that he doesn't have his medication and three days is not an improper delay. And I believe that that's what the magistrate ruled as well, is that the action itself did not rise to the level of a serious medical need. So I don't know. I can't point to what in the record supported that. But I take it we are not going to address the dismissal account for it. We're not going to address the, what is it, the count five, no, excessive force claim, count five. Well, we've got three minutes and your opponent ran out of time before we got to that issue, so normally we only respond to what's addressed. But if you have a, if you're through with this issue and you've got time left, I suppose you can talk about that one. I don't want to abuse the Court's time. I'm fine if the Court has no particular question. I mean, what he, what I understand he did was he, he, Mr. Lyons wrote an emergency kite when he was in a different institution. He had been transferred for some reason. And the emergency kite, the procedure is that emergency kites are only for, quote, emergencies. So they decided there was no emergency. Well, they pulled him aside to interrogate him. Well, the issue is they decided there was no issue. Mr. Powell sent Mr. Luskiewicz to the cell. Mr. Powell said just reassure him everything's fine. Mr. Luskiewicz said something different. Luskiewicz said Powell ordered him to the cell to calm him down. Powell says he was told by Luskiewicz just to tell him no emergency. And then Luskiewicz handcuffed him, took him to another cell. And there was a, I don't know. So there was a, that's the question, I guess, in this case, whether, and then there's a dispute between Lyons and Luskiewicz as to whether the handcuffing was necessary, whether the, whether the flap was working, and, but the real dispute, I think, is between Mr. Luskiewicz and Mr. Powell. Powell says he told Luskiewicz to say there was no emergency. Luskiewicz says Powell ordered him to the cell to calm down the dispute among inmates. And that all resulted in the handcuffing, dragging him to another cell. Well, Your Honor, I would, I would respectfully disagree in the sense that the dispute, I think the claim arises out of the conduct of handling him to interrogate him. And the process is always that you restrain them to whenever you restrain an inmate when you're going to move him. And so he's complaining that their conduct in the course of administering the restraint was excessive. And the question is, why, is that what he was supposed to do, to go down and interrogate him? Because Luskiewicz says he was sent down to calm a dispute among inmates, which would certainly authorize interrogating him. Powell says that he was just, sent Luskiewicz just to tell him everything's fine. There was no dispute among the inmates. Is that wrong? I thought, I thought the record was pretty clear that the reason that they wanted to interrogate him was to determine the nature of the emergency asserted in the grievance and whether there was a life-threatening or some sort of circumstance of that nature. The grievance just said they shouldn't be put in the same cell until they're categorized, and that's what all he complained about. Well, yeah, but it's an emergency grievance, Your Honor, and that's what's critical about it. An emergency grievance is a different procedure from just a regular grievance. An emergency grievance involves And Powell says he told Luskiewicz, just tell him there isn't any emergency. Just go tell him that. Well, maybe he did, but I don't know. They have to find When you have two inmates together and one inmate says, look, I've got an emergency here, the process is there's administrative regulation and here's what an emergency is. I've told him to say there is no emergency, there's no problem, and then Lyons says that he was told by Luskiewicz, don't file any more grievances. Well, you can't the Powell has no authority to determine there is no emergency. You have to ask the inmate what the nature of the emergency is, because it could be a threat to his safety. And we need to know whether you're asserting there's a threat to your safety, because we have a duty to protect you. Well, I guess the real question is, and I hate to do much because you've gone over, that here come three guys to your cell, he's ordered to the ground, they enter the cell, they handcuff him, they take him in a separate room, he's seated in a chair, he's cursed at for writing the grievance, and then they take him back to the cell and they tell him, don't write any more grievances. Right. Now, taking the facts as alleged by the claimant, which I must on summary judgment, the big question is, is that enough to get past the standard of review on this particular count? Okay. If I may. One minute. The retaliation, there are insufficient elements to constitute a retaliation claim because there's no retaliatory action. So the threat of retaliation alone is not enough. There's no allegation of the consequence of the action that takes care of the retaliation claim. As to the force, the force is proper in the procedure and the record constitutes the use of restraint is proper. Then the Mr. Lyons admits the amount of force was not, he doesn't admit this, excessive. He says he had to be restrained. He had to the cuffs were tight. They had to pull him up because he can't get up by himself. They had to assist. He claims that was excessive, but he admits they have to assist him. Basically, he admits that what they did, they had to do. He just makes a, then he makes a bold claim that what they had to do constituted excessive force. And I don't believe there's a question of fact in there at all, I think, that dehydrates  Thank you very much, Your Honor. Oh, I'm sorry. Did you, are you going to ask me another question? I don't know. Can I ask you to sit down? Thank you. May I direct the Court to one page in the record that will answer Judge Hawkins' question about communication, if I may? Yes, please. Tell him the page. Page 485 is the kite that communicated his plight to the defendants in counts one, two, and three. 485. Gotcha. Thank you. And that's volume C. Thank you, Your Honor. Thank you. Thank you. The case is argued and will be submitted.
judges: Reinhardt, Hawkins, Smith N. R.